[No. 7536. Department One. September 27, 1909.]

### Victor W. S. Denny, *Appellant*, v. J. H. Holden *et al.*, *Respondents.*[1]

Trusts — Resulting Trusts—Evidence—Sufficiency. In order to establish a trust in mining claims by virtue of a parol agreement, for an interest, the testimony must be clear, cogent, and convincing; and is insufficient, where the trust is based on a grub stake agreement whereby defendant was to prospect and locate mining claims for, and as an equal partner of, the plaintiff, who was to furnish the funds, and where the evidence as to such an arrangement is conflicting, the plaintiff and defendant were close friends, the plaintiff's letters indicate that at first he claimed no legal interest in the property, he did not furnish any of the money to develop the mine, made no claim to it during five years that it was being developed at great expense, and his evidence at the trial ten years after the agreement is unsatisfactory.

Appeal from a judgment of the superior court for Chelan county, Steiner, J., entered January 27, 1908, upon findings in favor of the defendants, dismissing an action to declare a trust in real property, and for an accounting. Affirmed.

*William Martin* and *John B. Denny*, for appellant.

*Graves, Kizer & Graves*, for respondents.

Gose, J.—The appellant commenced this action against the respondents, owners of the legal title to three certain mining claims in Chelan county, this state, for the purpose of obtaining a decree declaring him to be the owner in fee of an undivided one-half interest therein, and having the respondents declared to be the trustees therefor, and requiring them to convey such interest to him, and for an accounting. We will hereafter refer to the respondent J. H. Holden as if he were the sole respondent.

The complaint alleged that, in the fall of 1895, the appellant and the respondent entered into a verbal contract of partnership, to continue for an indefinite time, for the pur-

[1]Reported in 103 Pac. 1109.

pose of prospecting for mineral and locating mining claims in the county of Okanogan and elsewhere; that each party should defray one-half of the expenses of the enterprise; that all mining claims discovered, located, or acquired by either or both should be owned by them in equal parts; that pursuant thereto, in the spring of 1896, they secured the necessary outfit and supplies, and began and continued prospecting until the 24th day of July, 1896, at which time the respondent discovered and located three mining claims upon the public lands of the United States in what was then Okanogan county in this state, but now is Chelan county; that the respondent staked the claims and posted and recorded notices of location, in conformity with the Federal and state statutes; that the appellant paid more than one-half of the expense of procuring the outfit and provisions for carrying on the work, and otherwise performed the contract on his part; that the respondent, without the consent of the appellant and with intent to cheat and defraud him, filed and recorded the notices of location of each of the claims in his own name; that long prior and subsequent to the filing of the notices of location, the appellant and the respondent were close friends; that the respondent represented to him that keeping the claims in the name of the latter would add to the convenience of working and handling the properties; that the appellant, relying upon his statements, allowed the claims to remain of record in the name of respondent; that upon discovering that the respondent was asserting the entire ownership in the property, he demanded a conveyance to himself of an undivided one-half interest in each of the claims, and for an accounting, and that the appellant refused to comply with this demand. It is further alleged that the mining claims are of the value of $1,000,000. The answer admitted the discovery of the claims, the filing and recording of the notices, and assertion of the entire ownership in respondent, and denied that any partnership or other agreement was made having for its object the prospecting for mineral or the location of

mining claims. Upon issue being joined, the case was tried by the court, and a judgment of dismissal entered. From such judgment, this appeal is prosecuted.

The appellant seeks to establish a resulting trust by parol evidence, to show that the respondents, the owners of the legal title to the property in controversy, hold title to the extent of an undivided one-half interest in trust for him. In such case the evidence must be clear, cogent, and convincing before a trust will be declared. 3 Pomeroy, Eq. Jur. (3d ed.), 1040; 15 Am. & Eng. Ency. Law (2d ed.), p. 1174; *Howland v. Blake*, 97 U. S. 624, 24 L. Ed. 1027; *Chambers v. Emery*, 13 Utah 374, 45 Pac. 192; *Rice v. Rigley*, 7 Idaho 115, 61 Pac. 290.

The following case also illustrates this view: *Voorhies v. Hennessy*, 7 Wash. 243, 34 Pac. 931.

The evidence shows that the three claims were discovered and located by the respondent July 24, 1896, upon which date he filed and recorded notices of location in his individual name; that the suit was commenced June 12, 1902; that an acquaintance between the parties, which soon ripened into a friendship, commenced in 1888 or 1889; that this friendship continued, seemingly unabated, at least until May, 1899; that the correspondence between them from some time prior to 1896, to May, 1899, was frequent, and that they had almost an affectionate regard for each other; that the respondent between 1889 and 1896 was frequently employed by the appellant's father; that at such times he lived with the latter, the then home of the appellant, and was treated almost as a member of the family; that in 1893 he prospected for the appellant in the Chelan district; that in 1894 he was with the appellant and other members of his family in the Chelan country as a guide; that in 1895 the respondent prospected in the Chelan country on his own account; that during the winter of 1895-6 he lived in the Denny home and worked for them. The facts heretofore stated seem to be undisputed.

The evidence further shows that some time in April, 1896, the appellant and the respondent left Seattle, the home of the former, and went to Lake Chelan; that there they procured a boat and some provisions and engaged principally in hunting and fishing until about May 12 following, when the appellant returned to his home; that they each paid one-half of the cost of the boat and provisions; that when the appellant returned home, he left his part of the provisions, amounting to a few dollars in value, his interest in the boat, and some personal effects, with the respondent; that at the lake he purchased and paid for two or three dollars' worth of provisions, and had them forwarded to the respondent; that the appellant did not again return to Chelan county in 1896; that in July following the departure of the appellant, the snow having disappeared in the mountains, the respondent began active prospecting, and soon discovered and located the mining claims in controversy; that about December, 1896, the respondent returned to Seattle and worked during the winter at the Denny home for his board; that the appellant advanced to the respondent a small sum of money on two separate occasions in 1896; that during the winter of 1896, the respondent borrowed a sum of money with which to work the claims, and in the early spring of 1897 returned to the mines, followed by the appellant about June 1 following; that the appellant worked at the mine with moderate regularity, without receiving wages, from some time in June to the 1st of September, 1897, when he again returned to Seattle; that he did not thereafter return to the mine; that in 1898 the respondent did the assessment work on the mine; that the respondent, without any assistance from the appellant, borrowed money, and sold a mining claim, and with this fund worked on the mine in 1897, and did the assessment work in 1898; that in 1899 and thereafter he sold mining stock and expended the proceeds in developing the mine; that at the time the suit was commenced, the respondent had

expended ten or twelve thousand dollars in opening the mine so as to make it productive.

The case was tried in November, 1907. The appellant, his wife and sister, testified that in the winter of 1895-6 the appellant and respondent agreed to outfit and prospect together in 1896 and share equally whatever was located by either. The wife and sister testified that, when the respondent returned to Seattle in the winter of 1896, he often referred to the fact that he and the appellant owned the mine together. A brother-in-law of the appellant, who worked in the mine in the summer of 1897, testified that the respondent told him on three separate occasions that the appellant owned an interest in the mine. Other witnesses called by the appellant gave evidence tending to support the appellant's claim. It is upon this evidence, and two letters written by the respondent, that the appellant relies to establish his case. On July 12, 1896, the respondent wrote the appellant as follows:

"R. R. C. July 12th, 1896.
"V. W. S. Denny, Seattle, Wn.

"Dear Friend:—Yours of June 28th at hand and contents read. In reply will say was glad to hear all was well and progressing. Hope you are in the Park ere this and are able to begin work. I am already to start up R. R. creek tomorrow morning. Mr. Robinson is with me. We have four horses here to pack up the creek. The snow I have all gone so I can go well up by this. I had a very pleasant time down the lake. . . . Win I do not need any funds now, aint out of grub yet, but don't know how soon I may be not for six weeks any way. Thanking you very much for your thoughts of me and my welfare should I find anything you will share equally with me."

On July 26, after filing the notices of location, the respondent again wrote a letter to appellant, from which we excerpt the following:

"Moore, Okanogan County, Wash., July 26th, 1896.
"Mr. V. W. S. Denny, Seattle, Wn.

"Dear Friend:—Your most valued letter with money came to hand a few days ago and reached me through Mr. Robin-

son.  I was up R. R. Creek about 15 miles camped and as he passed he gave me the registered pkg.  Well, Victor, I have lost in flesh as it have been warm and I have been hitting the hills hard.  I send you a specimen of what I have found and if it proves good I am a rich man if not will, but toiling over these everlasting hills alone.  I do not know the width of or thickness of the mineral, nor do I know the width of ledge. It is at least 20 feet and as far as I could pick across which is about 4 feet, is solid mineral like the two pieces rolled together.  The other piece is from another part of the ledge. I want one of the two pieces tried and the single piece separate.  It is only about 1500 feet from the creek with the finest timber for mine and cabin purposes that a body could wish.  I have located 4 claims and their are on one place. Shows over 6 feet of solid mineral.  The ledge so far shows more mineral than all the mines on Meadow Creek and Horse Shoe Basin.  If it is any good I am in it, and *you are not left out.*"  (The italics are the respondent's.)

In addition, the appellant testified that in November, 1897, he wrote the respondent a letter, demanding that the latter deed him a one-half interest in the property.  He further testified that the respondent answered, saying: "If you sue me I will fight you to the bitter end.  But if you do not you will still have your interest in the property."  This letter was denied by the respondent and was not produced at the trial, the appellant stating that it had been lost.  In 1902 the appellant served upon the respondent a written demand for a deed to a one-half interest in the property.  The appellant testified that his father, D. T. Denny, knew of this partnership arrangement.  On September 21, 1897, the latter wrote the respondent: "Every one is taken with the ore from your ledge.  .  .  .  Your property can be placed," etc.  November 8 following he wrote him, "What is Victor's interest in the mine?"

The respondent testified, in substance, that no partnership or other joint agreement was made between the appellant and himself; that the appellant, at no time prior to the service of the demand in 1902, claimed to own any interest in

the property; that he had repaid the appellant for all loans and advances from the money he borrowed in 1896; that in 1896 and 1897 the appellant came to the Chelan country primarily for the benefit of his health; that he had worked the mines with money obtained as a loan, by the sale of mining claims in which the appellant did not claim any interest, and by a sale of mining stock without any aid or assistance from the appellant; that when the suit was commenced, he had expended ten or twelve thousand dollars in opening up the mining property to make it productive. On June 8, 1898, the appellant, in a letter to the respondent, said:

"Seattle, Washington, June 8th, 1898.
"Mr. J. H. Holden,
    "Dear Friend:—Yours of the 3d rec'd yesterday. I did not know my father had written you about that $20.00. He asked me when we were up at Lake Kichelos that summer if I thought you needed it and I thought perhaps you did. As near as I can tell we sent $35.00 to you and the $20.00 note I gave you made $55.00. This just equals the amt you gave me last year, $35.00 here and $20 at the lake. . I never expected you to pay me wages for my work. My expectation is that you will give me something if you make a stake."

And on November 16, 1897, he again wrote the respondent:

"Seattle, Wash. Nov. 16th 1897.
"Mr. J. H. Holden,
    "Dear Friend: I was glad to hear you were down again and all right. Was afraid you would have a hard trip out. The folks are all well as usual.  .   .   .   I did not want my father to say anything about Austin's money as I knew you would not care to do it. Mr. Austin is all right I think, and will do the square thing. I did not want my father to say anything about my interest in the mine either, but will tell you why I thought I had an interest. On July 12th 1896 you wrote me a letter saying you were already to start up R. R., and if you found anything you would share equally with me. I have not given myself much concern about the matter as I believe you will do what is right by me. What I did for you in the past I did through friendship for you. More than once I gave you all the money I had and I don't

feel any different now. I have never done anything to injure you but have done my very best to make a good showing on the property. But should I never get anything I will not regret the past for we have had some very pleasant times together. So don't be troubled but let us be the good friends that we are. I will be very glad to see you this winter. Would like to have you stop with us a while if you care to. I hope you are well and hearty again."

On October 24, 1896, he wrote the respondent, "I paid Johnson for your assay;" and on March 10, 1897, he again wrote him, "That was a good return they got from your rock;" and on January 6, 1898, in a letter to respondent, he said: "The 'Chelan Leader' had you sold out. Also some women from the lake side said you had sold, or Arthur J. said so at least. Wont hurt them to think so though it may be true by this time."

After writing these several letters and until May 14, 1899, as we have seen, there was a continuous correspondence between the parties. Subsequent to November, 1897, the time the appellant testified that he wrote the respondent demanding a conveyance of a half interest in the mining claims, the record contains letters written by the appellant to the respondent on the following dates: In 1897, December 3, 11, and 22; in 1898, January 6, 15 and 30, February 18 and 28, March 8 and 28, April 21, May 7, July 1, October 30, November 22, and December 28; in 1899, January 1 and 22, March 8, April 2, May 14 and 26. These letters are pregnant with evidence of a close friendship, and indicate that the appellant was receiving letters from the respondent. In the dozens of letters in the record written by the appellant to the respondent, aside from those mentioned, there is nothing to indicate that the appellant claimed any interest in the property. They are friendship letters only.

They do, however, contain many things which point to the want of merit in the appellant's case. He testified that in 1896 the property was worth $100,000. In these letters he frequently refers to the intended and actual development

work on mining claims in which he was interested in the Lake Kichelos district in Kittitas county. He admitted that, from September, 1897, to the time the action was commenced, he had no information as to any work that was doing on the property in controversy, aside from what he saw in the newspapers. It is inconceivable that he would during all these years manifest no interest, other than a friendly one, in a property of such value, if at that time he entertained an honest belief of ownership to the extent of a one-half interest.

His own letters show that he was pressed for money; that he was much interested in the development of the other property; that he had almost a brotherly affection for the respondent, and hoped that the claims would develop into a valuable property. Moreover, one Austin, the party who loaned the respondent the money in 1896 with which to work the mine, and the Austin referred to in appellant's letter, testified that he was at the mine about a week in 1897; that each of the parties was there; that he was examining the property with a view to finding a buyer, and that he received no suggestion from any one to the effect that the appellant had an interest in the property. Referring to the appellant's letter of date November 16, 1897, written after the respondent had replied to the letter of D. T. Denny, stating that the appellant had no interest in the property, we find him saying: "But will tell you why I thought I had an interest. On July 12 you wrote me a letter saying you were already to start up R. R. If you found anything you would share equally with me." Why did he not say, in ringing words so clear as not to be misunderstood: "I own a half interest in the property. You and I made an agreement to prospect together, sharing equally what either or both discovered. We purchased the provisions, journeyed into the mountains, pitched our tent, and began work. I was compelled to return home, but left you provisioned so that you could and did continue under the contract. Your discovery inured to my benefit. My rights rest in contract, and I own and intend to assert and establish

my undoubted right to an equal interest in the result of our joint venture."

The whole matter was then, if ever, fresh in his memory. Is it not our duty to conclude that he would have resented a denial of his property rights in some such emphatic words? Such a conclusion seems inevitable. It squares with common observation and experience. It seems incredible that, after writing such a letter, he would have written another letter in two weeks demanding a conveyance of one-half interest in the property as a matter of absolute right. The indifference which he manifested to the property from 1897 to 1902, a property which he asserts was of the value of $100,000 in 1897, his conduct during that period, measured by what the ordinary man similarly situated would have done, explained as it is by his own letters, gives the strongest corroboration to the respondent's assertion of ownership. The letters suffer no loss by lapse of time.

The testimony of the appellant and his witnesses, read in connection with the letters, is but another evidence of the fallibility of human memory, and the lack of probative force of oral evidence as to statements made many years before the testimony was given. Experience and observation teach that, when ten years have intervened between the date of a conversation and the trial, the memory of witnesses as to verbal declarations made by another is the weakest kind of evidence. The law, in view of the liability of the human mind to err in remembering the statements and declarations of parties, receives and weighs such evidence with great caution. We are inclined to regard the language in the letters of the respondent, "Should I find anything, you will share equally with me," and in the later one, "If it is any good I am in it and you are not left out," as gratuitous expressions from one friend to another, when read in the light of the record as a whole. The appellant's letter shows that he did not expect to be paid for the work in 1897. He thought it would be recognized as

a moral obligation if the property developed into a paying mine.

Measured by the law as we announced it in the beginning, we conclude that the appellant has not established his case by that clear, cogent and convincing evidence which the law requires, and the judgment will be affirmed.

RUDKIN, C. J., FULLERTON, and CHADWICK, JJ., concur.